815 F.2d 702
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Marilyn DUNCAN et vir, A.Y. Duncan, Plaintiffs-Appellants,
v.
H.M. LEEDS, M.D., and Roy McDonald, M.D., Defendants-Appellees.
 No. 86-5125.
 United States Court of Appeals, Sixth Circuit.
 March 27, 1987.
 
 Before MARTIN and NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The plaintiffs in this medical malpractice action appeal from a judgment entered upon a jury verdict in favor of the defendant physicians. The plaintiffs raise three issues on appeal: (1) whether the district court improperly excluded out-of-court statements; (2) whether the district court committed prejudicial error in separating issues for determination by the jury; and (3) whether the district court erred in failing to direct a verdict, on its own motion, in favor of the plaintiffs. Finding no reversible error, we shall affirm the judgment of the district court.
 
 
 2
 In 1970, when plaintiff Marilyn (Ross) Duncan was fifteen years old, she was admitted to the Scott County Hospital in Tennessee as a patient of defendant Leeds. She was suffering from abdominal pains, vomiting, and diarrhea. Marilyn's condition and Dr. Leeds' course of treatment over the next three weeks are far from clear, because the hospital, in accordance with its established records retention policy, destroyed many of the pertinent records after ten years. Dr. Leeds testified that he could remember nothing of Marilyn's illness. The other defendant, Dr. McDonald, who had consulted with Dr. Leeds on Marilyn's case and had performed surgery on her, suffered an aneurysm before the trial and was not able to testify.
 
 
 3
 The records that were not purged indicate that Dr. Leeds' admission diagnosis was acute enteritis, paralytic ileus, and dehydration. Dr. Leeds ordered stool cultures, abdominal x-rays and hydration. Reports of x-rays taken at various times during Marilyn's hospitalization indicated ileus and fluid in the peritoneal cavity, with suspicion of peritonitis; possible pneumonia; and peritonitis or abscess of the abdominal cavity. Dr. McDonald performed an incision and drainage of the abscess.
 
 
 4
 A discharge summary dated three weeks after admission reported that Marilyn had been experiencing high temperatures daily, that she had been treated with antibiotics, that a nasal tube connected to a suction machine had been introduced into her stomach, and that rectal tubes were used. The summary further stated that "she slowly improved" and was being transferred to the University of Kentucky Hospital in Lexington for treatment and observation. The final diagnosis was stated to be "generalized peritonitis, etiology unknown."
 
 
 5
 Mrs. Trudy Ross, Marilyn's mother, testified that she removed Marilyn from Scott County Hospital. She attempted to testify that she took Marilyn out of the hospital because of a conversation Marilyn's grandmother had with a nurse's aide from the hospital. Although the court would not permit Mrs. Ross to give hearsay testimony on the content of the conversation between the nurse's aide and Marilyn's grandmother, the aide later testified to that conversation herself.
 
 
 6
 The nurse's aide, who testified that Marilyn "was real sick," vomiting "infection," and suffering from temperatures that "spiked" as high as 104 degrees, testified that she met Marilyn's grandmother at a market and told her "[i]f it was a child of mine, I'd take her out of there." The court would not permit the aide to testify that she told Marilyn's grandmother that Marilyn was "going to die" if left at that hospital. Neither was the aide permitted to testify that she had heard from other hospital personnel that Dr. McDonald wanted to operate on Marilyn but Dr. Leeds would not permit him to do so.
 
 
 7
 A Dr. Belin, who saw Marilyn in the emergency room at the University of Kentucky Hospital upon her transfer from the Scott County Hospital, testified that Marilyn appeared "terminally ill, near death." He performed surgery within hours of her admission, and the surgery revealed an "old ruptured retrocecal appendicitis." Dr. Belin said that the purulent material within her pelvis had come from the previously ruptured appendix.
 
 
 8
 Marilyn did not file this action until 1983, approximately a year after she was told that she was likely to be infertile due to the presence of scar tissue. The complaint was initially dismissed on the ground that the action was barred by the statute of limitations. The dismissal was reversed on appeal and the case remanded for trial. Duncan v. Leeds, 742 F.2d 989 (6th Cir.1984).
 
 
 9
 At trial, after presentation of all the evidence, the court first submitted the issue of negligence to the jury, reserving the issues of fraudulent concealment and damages for subsequent consideration in the event of a finding for the plaintiffs on the negligence issue. The jury found that the defendants were not negligent. The court denied a motion for a new trial, and this appeal followed.
 
 
 10
 The plaintiffs claim that the district court erred in its evidentiary rulings regarding the nurse's aide's statements, erred in submitting the negligence question to the jury without submitting the fraudulent concealment question at the same time, and erred in failing to direct a verdict for the plaintiffs.
 
 I. Statements of Nurse's Aide
 
 11
 The plaintiffs contend that the proferred testimony as to what the nurse's aide said to Marilyn's grandmother was not hearsay because it was offered to prove the reasonableness of Mrs. Ross' action in removing her daughter from the hospital. The plaintiffs make the same contention with respect to the exclusion of the aide's testimony on what she had heard about the difference of opinion between Drs. Leeds and McDonald on how best to treat Marilyn.
 
 
 12
 The contention fails for two reasons. First, the reasonableness of Mrs. Ross's decision to remove Marilyn from the hospital was not in issue. Mrs. Ross testified that she took her daughter out of the hospital over the objection of Dr. Leeds, but no one contended at the trial that the move was unreasonable; plaintiffs suggest, indeed, that Dr. Leeds attempted to show that he himself transferred Marilyn.
 
 
 13
 Second, the jury did learn, from one witness or another, that the nurse's aide told Marilyn's grandmother she would remove Marilyn from that hospital, that the grandmother repeated this to Marilyn's mother, and that Marilyn's mother removed Marilyn from the hospital as a result. That those conversations took place was never disputed.
 
 II. Separation of the Issues
 
 14
 We see no merit in the claim that it was error to separate for jury consideration the issues of medical negligence and fraudulent concealment. Plaintiffs admit that they agreed at trial to separating the issues for jury consideration, they admit that they did not object to the jury instructions as given, and they admit that the evidence of concealment was before the jury when the jury retired to consider the negligence question.
 
 
 15
 Plaintiffs submit that concealment bears on the issue of whether Dr. Leeds knew the condition of his patient, and therefore counsel should have been permitted to argue concealment before the jury retired to deliberate on the negligence issue. The record contains no indication that plaintiffs' counsel ever attempted to make such an argument to the jury, however, and it was admitted at oral argument that the trial court never ruled on the record that such a jury argument could not be made.
 
 III. Directed Verdict
 
 16
 The short answer to plaintiffs' contention that the trial court should have directed a verdict in their favor is that plaintiffs never moved for a directed verdict. It has long been held that if a party fails to move for a directed verdict, this court will not second-guess the trial court "unless a miscarriage of justice will result." In Re Charmar Investment Co., 501 F.2d 1349, 1350 (6th Cir.1974); Warner v. Kewanee Machinery & Conveyor Co., 411 F.2d 1060, 1063 (6th Cir.1969), cert. denied, 398 U.S. 906 (1970). No miscarriage of justice occurred here, because defendants' evidence, considered in the light most favorable to them, created a question properly submissible to the jury. Cf. Warner, 411 F.21 at 1063.
 
 
 17
 Dr. Leeds testified, based on the records, that Marilyn's symptoms and her peritonitis could have been caused by many things other than the undiagnosed appendicitis. Pneumonia could have been the cause, and the x-ray reports did indicate the possibility of pneumonia.
 
 
 18
 Dr. Kline, an expert witness called by the defense, agreed with Dr. Leeds that many things can cause peritonitis. He testified that Marilyn's symptoms, as documented by the available hospital records, were unusual for appendicitis, and he said that he would have made decisions similar to those made by the defendants. The course of treatment as described by the hospital records met an acceptable standard of medical care, according to Dr. Kline.
 
 
 19
 Dr. Belin's testimony on that issue was somewhat contradictory. When asked on direct examination whether he thought Drs. Leeds and McDonald had "conformed to acceptable medical practice in terms of the time that they may have made a referral or the appropriateness of doing a referral," Dr. Belin responded in the negative; "this child," he said, "had been terribly ill for an inordinate amount of time without some course of action being taken which was somewhat definitive...." On cross-examination, however, when asked whether he meant to "imply that things didn't go right at Scott County Hospital," he responded that he did not mean to imply that.
 
 
 20
 Viewing the evidence in the light most favorable to the defendants, we are satisfied that it provides an acceptable basis for the jury's verdict.
 
 
 21
 The judgment of the district court is AFFIRMED.